In re:                                                    Chapter 11 Cases

PGI Companies, Inc., and                                  Case No. BKY 09-42883
PGI Fulfillment, Inc.,                                    Case No. BKY 09-42884

                        Debtors.                          Jointly Administered

---

**DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF REORGANIZATION OF PGI COMPANIES, INC.
AND PGI FULFILLMENT, INC.
AUGUST 31, 2009**

---

I.      INTRODUCTION.

        PGI Companies, Inc., ("PGI Companies") and PGI Fulfillment, Inc. ("PGI Fulfillment," together with PGI Companies, the "Debtors") filed petitions for reorganization under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") on May 7, 2009. The Joint Plan of Reorganization Of PGI Companies, Inc. and PGI Fulfillment, Inc., dated August 31, 2009 ("Plan") sets forth, among other things, the proposed treatment of claims and interests in accordance with the Bankruptcy Code.

        This disclosure statement ("Disclosure Statement") is intended to explain the Plan and provide adequate information to allow an informed judgment regarding the Plan. A copy of the Plan is included with this Disclosure Statement. Capitalized terms used in this Disclosure Statement shall have the meanings ascribed to them in the Plan or by the Bankruptcy Code unless the context otherwise requires. If the Plan and this Disclosure Statement are not consistent, the terms of the Plan control.

        A.      Summary of the Plan.

        Upon the Effective Date of the Plan, all assets and liabilities of PGI Fulfillment will transfer to PGI Companies, and the combined assets of the bankruptcy estates will vest in PGI Companies, the Reorganized Debtor, which will continue to operate its business. The current officers and directors will continue in their positions.

        Allowed administrative expense claims will be paid in full on the Effective Date, or as agreed by holders of such claims, or as later approved by the Court. The Debtors estimate that the outstanding allowed administrative expense claims will not exceed $350,000.

The senior secured lender, Associated Commercial Finance, Inc., will have an allowed secured claim of $3,663,498. The allowed secured claim will be paid in monthly installments of $46,000.00 in principal and interest paid at a rate of prime plus 1.5%, with a floor of 5%.

Creditor James Ripka, an officer and former owner of the Debtors, holds a claim in the amount of $2,500,000 secured by stock in the Debtors that is held in their treasuries. James Ripka will receive that stock in full satisfaction of his claim, which will make him a 50% equity holder in the Reorganized Debtor.

Holders of allowed general unsecured claims less than $2,000 and other holders who so elect will be treated under an Administrative Convenience Class. Holders of allowed claims in this class will receive the lesser of 30% of the amount of their claim or $600 on March 31, 2010.

The Debtors will make distributions to the class of holders of general unsecured claims on a quarterly basis. The Plan provides for 20 equal quarterly payments totaling 30% of the allowed general unsecured claims. Distributions will commence on March 31, 2010, and continue on the last day of the month of each calendar quarter until all payments are made.

Jeffory Brower, who currently owns 100% of the outstanding shares of the Debtors, will retain his ownership interests. After the effective date, Jeffory Brower and James Ripka will each have 50% of the outstanding shares of the Debtors.

The following table provides a summary of the classifications and treatment of claims and equity interests under the Plan and is qualified in its entirety by reference to the Plan and by claims adjustments prior to and after the Effective Date.

| Class | Description of the Class | Estimated Amount of Claims | Treatment | May Vote |
|-------|--------------------------|----------------------------|-----------|----------|
| N/A | Administrative Expenses | $350,000 | Paid in full on the Effective Date, or as agreed, or as allowed | No |
| N/A | Statutory Fees and Court Costs | $0 | Paid in full on the Effective Date | No |
| 1-A | Secured Claim – Associate Commercial Finance, Inc. | $3,663,498 | Paid in full over time | Yes |
| 1-B | Secured Claim – James Ripka | $2,500,000 | Exchanged for equity | Yes |
| 2-A | Administrative Convenience | $62,000 | 30% recovery on March 31, 2010 | Yes |
| 2-B | General Unsecured Claims | $4,169,000 | 30% recovery over 20 quarters | Yes |
| 3-A | Equity Holder | N/A | Retains equity interest | No |

Debtors will continue to perform under contracts and leases assumed, modified, or entered into during the bankruptcy cases as well as contracts and leases set forth on Exhibit A to the Plan. All other leases and executory contracts in effect at the Effective Date and not addressed elsewhere in the Plan will be rejected.

B.    Voting Procedure.

A ballot to be used for voting to accept or reject the Plan is enclosed with all copies of this Disclosure Statement mailed to all classes entitled to vote. Pursuant to Section 1126 of the Bankruptcy Code, holders of claims in a class identified in Article I.A. of this Disclosure Statement are entitled to vote with respect to the Plan.

Please fill out, sign and mail the enclosed ballot to the following address:

United States Bankruptcy Court
301 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

The Court has set a deadline for filing ballots accepting or rejecting the Plan. That deadline is set forth in the enclosed order and notice. Please mail your original ballot to the Court in time for it to be *received* by the Court no later than that date.

THE DEBTORS URGE CREDITORS TO VOTE IN FAVOR OF THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN OFFERS THE BEST POSSIBLE RECOVERY FOR CREDITORS. QUESTIONS CONCERNING THE PLAN SHOULD BE ADDRESSED IN WRITING OR BY TELEPHONE TO DEBTORS' COUNSEL.

C.    Brief Explanation of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Upon the filing of a petition for reorganization under Chapter 11, Section 362 of the Bankruptcy Code generally provides for an automatic stay of all attempts to collect claims or enforce liens that arose prior to the commencement of the bankruptcy case or that otherwise interfere with a debtor's property or business.

The principal objective of a Chapter 11 lease is the confirmation of a plan of reorganization or liquidation. The plan sets forth the means for satisfying the claims of creditors and interests of stockholders of the debtor. The plan and a disclosure statement that contains information necessary to allow creditors and stockholders to evaluate the plan are sent to creditors and stockholders whose claims or interests are impaired and entitled to vote, who then vote to accept or reject the plan.

A class of claims is entitled to vote to accept or reject a plan if that class is "impaired" by the plan. A class of claims is impaired unless the plan cures any defaults that may exist with respect to the claims and leaves unaltered the legal, equitable, and contractual rights to which the claim entitles the holder of the claim.

A plan may be confirmed under Section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each such class has voted to accept the plan. Votes will be counted only with respect to claims: (1) that are listed on the Debtors' Schedules other than as disputed, contingent or unliquidated; or (2) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim. However, any vote by a holder

of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order from the Court allowing such a claim for voting purposes. A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the allowed voting claims in the class have voted to accept the plan.

If an impaired class votes to reject the plan, the proponent of the plan can attempt to "cram down" the plan by confirming it under Bankruptcy Code Section 1129(b). A plan proponent may cram down a plan upon a rejecting class only if another impaired class has voted to accept the plan, and the plan does not discriminate unfairly and is fair and equitable with respect to each impaired class that has not voted to accept the plan.

Voting on the plan by each holder of a claim in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of such a claim should vote on the enclosed ballot either to accept of reject the Plan. Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted. A ballot that is not received by the deadline will not be counted. If a ballot is lost, damaged, or missing, a replacement ballot may be obtained by sending a written request to the Debtors' attorney.

11 U.S.C. § 1129(a) establishes the conditions for the confirmation of a plan. These conditions are too numerous to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process. Among the conditions for plan confirmation is that either each holder of a claim or interest who is entitled to vote must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

If the plan is confirmed by the Court, its terms are binding on the Debtors, all creditors, stockholders and other parties in interest, regardless of whether they have accepted the plan.

The purpose of this Disclosure Statement is to provide the holders of impaired claims with adequate information about the Debtors and the Plan so that they can make an informed judgment about the Plan's merits. The Debtors' Disclosure Statement is furnished pursuant to Section 1125 of the Bankruptcy Code. The information set forth in this Disclosure Statement is supplied by the Debtors and not by any other party.

THE DEBTORS AUTHORIZE NO REPRESENTATIONS OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE THAT ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION TO VOTE FOR OR AGAINST THE PLAN.

THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS BUT HAS NOT BEEN INDEPENDENTLY AUDITED. ALL STATEMENTS CONCERNING FINANCIAL DATA ARE MADE IN GOOD FAITH AND ARE INTENDED TO BE AS COMPLETE AND AS ACCURATE AS POSSIBLE WITHIN THESE LIMITATIONS. BANKRUPTCY COUNSEL

FOR DEBTORS IN THIS CASE, FREDRIKSON & BYRON, P.A., HAS NOT VERIFIED ANY OF THE FINANCIAL INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT.

## II. DESCRIPTION OF THE DEBTORS

### A. Nature and History of the Debtors' Business.

PGI Companies was founded in April 1983. The founders of PGI, Jeffory Brower and James Ripka, are still active in the business and directly involved in day-to-day operations. PGI's primary focus is the print, personalization, and distribution of direct mail and other ancillary print and fulfillment services.

In 1990, the founders of PGI Companies formed PGI Fulfillment to complement services being provided by PGI Companies. PGI Fulfillment's primary business focus is to provide handwork services, including pick-n-pack of customer-specific printed material. These services enhance the capabilities of PGI Companies with short run, direct target marketing efforts.

The Debtors' headquarters and principal facility is located in Minnetonka, Minnesota. When the Debtors entered chapter 11, they also had a second location in New Ulm, Minnesota, and employed a total of 130 full-time employees (105 in Minnetonka and 25 in New Ulm) and approximately 50 part-time employees.

The Debtors serve customers in the financial services, retail, advertising, health care, insurance, nonprofit, and various other industries.

### B. Debtors Obligations to Associated Commercial Finance, Inc.

The Debtors are both indebted to Associated Commercial Finance, Inc. (the "Lender") under a single secured revolving note and a single secured term note. The indebtedness is secured by substantially all of the Debtors' assets, the most significant parts of which are accounts receivable and equipment.

### C. Inter-company accounting and insider liabilities.

Debtors often provide services to customers on the same work projects. Because customers prefer to be billed by one Debtor instead of both, Debtors book sales from PGI Fulfillment to PGI Companies and the latter presented a single invoice to the customer. This practice results in a booked payable due to PGI Fulfillment in the projected amount of $2.9 million as of October 31, 2009.

In 1990 and subsequent years, Jeffory Brower and James Ripka borrowed funds from PGI Companies and contributed those moneys as a loan to pay start-up costs and other unfunded operating expenses of PGI Fulfillment. After repayment of some funds, $850,000 is still outstanding on the books and records of both Debtors. During the course of his employment, but not within the past three years, Jeffory Brower has received loans from the Debtors in the amount of $2,547,000. This amount is net of the $250,000 Mr. Brower paid back to the company in June 2008. Mr. Brower has also guaranteed Debtors' indebtedness to the Lender, the

landlords, contract and lease counterparties, and other creditors. Debtors believe Mr. Brower is insolvent and unable to repay amounts owed to Debtors.

        D.       Reasons for Filing Chapter 11.

When the United States economy entered into the current recession, the impact on the financial performance of the Debtors and their customers was profound. Direct marketing efforts including print, personalization, and distribution of direct mail by the financial services, insurance, retail, and other industries were especially hard hit. In 2007, before the recession, Debtors' gross revenue was $31 million. The recession started to take hold in the second half of 2008, and gross revenues for the year fell to $27.5 million. Gross revenues for 2009 are projected to be approximately $16.5 million.

For a good part of 2008, the Debtors' financial performance was tracking well with its original budget. However, in the month of September 2008, the Debtors' lost $400,000. The companies lost $540,000 for the year ended December 31, 2008.

In response to the material reduction in projected annual sales, the tightening of credit markets, and the overall economic environment, Debtors implemented a number of cost-saving measures. For example, since October 2008, Debtors have reduced payroll and payroll related expenses by $3,867,891, reducing full-time employee count from 178 employees to 130 in less than one year. All remaining employees have taken material wage and hour reductions. However, these and other cost-savings measures could not be implemented quickly enough.

In the month of April 2009, sales further slowed, and it became apparent the Debtors' were not going to have sufficient borrowing capacity under their line of credit to fund payroll and other related operating expenses. Debtors commenced these cases on May 7, 2009, after the Lender refused to make further advances to Debtors under the terms of its pre-petition lending agreements and insisted that Debtors agree immediately to a liquidation of their assets. Debtors filed these cases in order to preserve Debtors' going concern value for the benefit of all creditors, employees, and other stakeholders.

## III. SIGNIFICANT POSTPETITION EVENTS.

        A.       Cash Collateral.

At the outset of the cases, Debtors and Lender disputed the value of the Lender's Collateral and the Debtors' right to use cash collateral. The Court conducted an evidentiary hearing over two days to determine whether Debtors should be granted use of cash collateral and whether the Lender's rights in the cash collateral were adequately protected. The Court overruled the Lender's objections and permitted use of cash collateral. The Court also held that funds designated for prepayment of postage were property of the estates and part of the Lenders' Collateral. The Debtors and Lender subsequently stipulated to continued use of cash collateral on certain terms, including payments against the principal balance of the revolving loan in the amount of the postage funds held by the Debtors as of the commencement of the case; monthly interest payments on the outstanding principal balance of the revolving and term loans; compliance with cash collateral projections; and reporting requirements, among other things.

B.    Leased facilities.

As part of their cost-control measures, Debtors have notified their landlord in New Ulm, Minnesota, that they will reject the lease on that facility and vacate on or before September 30, 2009.  Debtors have also negotiated the terms of modified leases on their two buildings in Minnetonka, Minnesota.  Under the new arrangements, Debtors will retain the 70,000 sq. ft. entire building at 11400 K-Tel Drive and approximately 30,000 sq. ft. in the adjacent building at 11300 K-Tel Drive.  As a result, during the bankruptcy cases the Debtors will have reduced their leased space from approximately 170,000 sq. ft. to 100,000 sq. ft. and consolidated all operations into one primary location.

C.    Contracts and leases.

Debtors have renegotiated a lease with TCF Equipment Finance, extending the existing lease for prepress equipment through July 2012.  Monthly payments with a commencement date of August 1, 2009, have been reduced by $5,000 per month.  Debtors have rejected leases with OCE Financial Services for two remanufactured Variostream 7650 twin prints, effective October 2009.  Combined monthly lease and maintenance payments were $13,500.  Debtors have rejected a license and technical support services agreement with Streamline Solutions, with a combined balance due of approximately $298,000.

D.    Action against guarantor.

During the case the Lender commenced a lawsuit against Jeffory Brower to collect on his personal guaranty.  This litigation has been suspended by agreement of the parties.


IV.    SUMMARY OF THE PLAN.

A.    Treatment of Claims.

Section I(A) of the Disclosure Statement provides a brief summary of the classification and treatment of claims and equity interests.  The Plan that accompanies this Disclosure Statement provides a complete description, and all terms of the Plan are incorporated by reference.  If the Plan and this Disclosure Statement are not consistent, the terms of the Plan control.

B.    Means of Execution.

On the Effective Date, all of the assets of PGI Fulfillment will be sold to PGI Companies in exchange for PGI Companies' assumption of all Plan liabilities of PGI Fulfillment.  In addition, inter-company liabilities between the Debtors will be canceled and no distributions will be made under the Plan on account of any claim held any either Debtor against the other.  All guaranties of either Debtor of the obligations of the other shall be eliminated so that any claim against either Debtor and any guaranty thereof executed by the other Debtor and any joint or several liability of either Debtor shall be deemed one obligation of PGI Companies.  All allowed claims of PGI

Fulfillment will become the liabilities of PGI Companies under a separately-executed sale and assumption agreement.

PGI Companies will continue in business using cash flow generated from its ongoing operations, which shall be used to fund payments under the Plan and for general working capital purposes. Attached as <u>Exhibit A</u> is a projection and budget showing anticipated receipts and expenses, including actual and projected receipts and expenses during the bankruptcy cases.

Officers of the Reorganized Debtor shall be: Jeffory Brower, CEO; Dan Dallum, President; James Ripka, Executive Vice President; Jon Downing, Vice President; and Diane Nilson, Controller. The Directors of the Reorganized Debtor shall be Jeffory Brower, James Ripka, and Charles Belland. The directors shall receive no separate compensation for serving in their capacity as directors. Officers shall be paid on terms consistent with their compensation during the bankruptcy case.

V.     RELEASE OF BROWER, RIPKA.

Contemporaneously with the transfer of all PGI Fulfillment assets and liabilities to PGI Companies, amounts due to PGI Companies from James Ripka and Jeffory Brower and corresponding amounts due to James Ripka and Jeffory Brower from PGI Fulfillment shall be set off on a dollar-for-dollar basis. PGI Fulfillment will not honor its commitments nor will PGI Companies seek repayment of the amounts owed.

VI.    ANTICIPATED LITIGATION.

A.     Claim Objections.

Two claim bar dates have been established according to the Bankruptcy Code: September 30, 2009, for all creditors except governmental units, and December 8, 2009, for all creditors that are governmental units. The Debtors may object to any other scheduled or filed claims that are incorrect, but will compare filed claims to those scheduled and attempt to resolve any discrepancies before commencing the objection process. Because neither claim bar date has passed and all claims have not been filed, the Debtors have not completed their analysis of claims nor can it specifically identify claims to which they will object. The Debtors may object to a claim of a particular holder even if such holder votes for the Plan.

B.     Avoidance Actions.

Under section 547 of the Bankruptcy Code, certain transfers made by the Debtors to creditors within 90 days (or, in some cases, one year) of the Filing Date may be recovered as preferential payments. Such claims, and all avoidance actions under the Bankruptcy Code, are preserved by the Debtors under the Plan. Section 548 of the Bankruptcy code gives the Debtors power to avoid fraudulent transfers. The Debtors shall retain the sole discretion of whether to pursue such claims and whether to settle, dismiss, compromise, or withdraw such claims once commenced. The net proceeds of such claims shall be retained by the Debtors for use in making payments to unsecured creditors under the Plan or for business costs, at the option of the Debtors.

The Debtors are still reviewing their books and records to evaluate the existence of Avoidance Claims. The Debtors' preliminary review of payments to creditors within 90 days of the Filing Date, indicate that all payments were made to independent contractors, trade creditors, insurers or governmental taxing authorities in the ordinary course of business and are not subject to avoidance. The Debtors are examining payments made to or for the benefit of Jeffory Brower and his family members in the two years prior to the Filing Date but have not yet concluded whether such payments are avoidable or, if so, whether such payments are recoverable.

If further analysis indicates avoidance actions may be appropriate, the Debtors will taking into account the costs of pursuing such claims or the defenses that may be asserted by the transferee, including that the payments were made in the ordinary course of business or are offset by the subsequent provision of new value. Such claims, if they are pursued, will be pursued against persons or entities, such as unsecured creditors, who may otherwise be entitled to vote for or against then Plan. The Debtors may pursue such claims against a particular holder even if such holder votes for the Plan.

VII.    TAX CONSEQUENCES OF THE PLAN.

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtors, and to holders of general unsecured claims and interests. This summary does not address the federal income tax consequences to holders of allowed administrative expense claims, priority claims, or secured claims. This summary does not address foreign, state or local income tax consequences, or any estate or gift tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers. Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a claim or interest.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTEREST MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH SUCH HOLDER. THIS SUMMARY DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

A.    Federal Income Tax Consequences to the Debtor.

The Debtors anticipate that confirmation of the Plan will have no federal income tax consequences for the Debtors. During the Chapter 11 case, the Debtors have paid their postpetition tax obligations in the ordinary course of business pursuant to the tax laws.

Section 61(a)(12) of the Internal Revenue Code of 1986, as amended (the "Code"), provides generally that income from the discharge of indebtedness is includable as an item of

gross income. Code Section 108(a)(1)(A) provides an exception to Code Section 61(a)(12) by excluding from gross income any amount which, but for application of Code Section 108(a)(l)(A), would be includable in gross income by reason of the discharge of indebtedness of a taxpayer if the discharge occurs in a title 11 case. If, however, amounts are excluded from gross income under Code Section 108(a)(l)(A), various tax attributes of the taxpayer must be reduced. The Debtors believes that these tax attributes, including their net operating loss carryforwards, capital losses and loss carryovers, will exceed any income derived from discharge of indebtedness occasioned by the Plan or will have no tax consequences on the business going forward.

B.      Federal Income Tax Consequences to Holders of General Unsecured Claims.

In accordance with the Plan, holders of general unsecured claims will receive a distribution on such claims. Any holder of a general unsecured claim will realize a loss in an amount equal to such claim, minus any recovery, on an adjusted tax basis.

The tax consequences to holders of general unsecured claims will differ and will depend on factors specific to such holder, including but not limited to: (i) whether the claim, or a portion thereof, constitutes a claim for interest or principal, (ii) the origin of the claim, (iii) the type of consideration received in exchange for the claim, (iv) whether the holder is a United States person or a foreign person for tax purposes, (v) whether the holder reports income on the accrual or cash basis method, and (vi) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the claim.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A GENERAL UNSECURED CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A GENERAL UNSECURED CLAIM OBTAIN HIS, HER OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF A GENERAL UNSECURED CLAIM AS A RESULT OF THE PLAN.

C.      Federal Income Tax Treatment of Equity Interests.

In accordance with the Plan, a holder of equity interests will retain his equity interests or receive no recovery or distribution on such interests. If he retains his equity interests, such holder will experience no tax consequence. If he loses his equity interests, such holder will realize loss in an amount equal to such holder's adjusted tax basis in the interest. The character of any recognized loss will depend upon several factors including, but not limited to, (i) the status of the holder, (ii) the nature of the interest in the holder's hands, (iii) the purpose and circumstances of its acquisition, (iv) the holder's holding period, and (v) the extent to which the holder had previously claimed a deduction for the worthlessness of all or a portion of the interest.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF AN INTEREST. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF AN INTEREST OBTAIN HIS,

HER OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF AN INTEREST AS A RESULT OF THE PLAN.

        D.      Withholding and Reporting.

Payments of interest, dividends, and certain other payments are generally subject to backup withholding at the rate of 28% unless the payee furnishes his, her or its correct taxpayer identification number to the payor. The Debtors may be required to withhold the applicable percentage of any payments made to a holder who does not provide its taxpayer identification number. Backup withholding is not an additional tax, but an advance payment that may be refunded to the extent it results in an overpayment of tax.

THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN FEDERAL INCOME TAX CIRCUMSTANCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AN OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

VIII.   ALTERNATIVES TO THE PLAN.

The alternative to the Plan is liquidation under Chapter 7 of the Bankruptcy Code. If the Debtors were to convert these cases to Chapter 7, unsecured creditors will have no recovery. Attached as <u>Exhibit B</u> is an analysis of expected recoveries to creditors under a hypothetical chapter 7 liquidation of the Debtors, which estimates no recovery for general unsecured creditors. In contrast, the Plan provides for a minimum 30% recovery.

The liquidation analysis demonstrates that, on balance, and considering the interests of all creditors, parties are better off under the Plan than under a conversion of the case to Chapter 7.

IX.   ACCEPTANCE AND CONFIRMATION OF THE PLAN.

        A.      General Confirmation Requirements.

Bankruptcy Code section 1129(a) contains several requirements for confirmation of a plan. Among these requirements are that a plan be proposed in good faith, that certain information be disclosed regarding payments made or promised to be made to insiders, and that the plan comply with the applicable provisions of Chapter 11. The Debtors believe that they have complied with these requirements, including those requirements discussed below.

B.     Best Interests Test.

The "best interests of creditors" test requires that the Bankruptcy Court find either that all members of each impaired class have accepted the plan or that each holder of an allowed claim or interest of each impaired class of claims or interest will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To calculate what holders of Claims would receive if the Debtors were hypothetically liquidated under Chapter 7 of the Bankruptcy Code, the Court must first determine the dollar amount that would be realized from the liquidation (the "Chapter 7 Liquidation Fund") of the Debtors. The Chapter 7 Liquidation Fund would consist of the net proceeds from the disposition of the Debtors' assets (after satisfaction of all valid liens) augmented by the cash held by the Debtors and recoveries on actions against third parties, if any. The Chapter 7 Liquidation Fund would then be reduced by the costs of the liquidation. The costs of the liquidation under Chapter 7 would include the fees and expenses of a trustee, as well as those of counsel and other professionals that might be retained by the trustee, selling expenses, and unpaid expenses incurred by the Debtors during its Chapter 11 case (such as fees for attorneys, financial advisors and accountants) which would be allowed in Chapter 7 proceedings, interest expense on secured debt and claims incurred by the Debtors during the pendency of the case. These claims would be paid in full out of the Chapter 7 Liquidation Fund before the balance of the Chapter 7 Liquidation Fund, if any, would be made available to holders of unsecured Claims. In addition, other claims which would arise upon conversion to a Chapter 7 case would dilute the balance of the Chapter 7 Liquidation Fund available to holders of claims. Moreover, additional claims against the Debtors' estates might arise as the result of the establishment of a new bar date for the filing of claims in a Chapter 7 case. The present value of the distributions out of the Chapter 7 Liquidation Fund (after deduction the amounts described above) are then compared with the present value of the property offered to each of the classes of claims and holders of interests under the Plan to determine if the Plan is in the best interests of each holder of a claim.

The Debtors believe that the Plan as proposed is in the best interest of all creditors. If impaired creditors do not accept the Plan and the Debtors were forced to liquidate its remaining assets in Chapter 7, holders of general unsecured claims would receive essentially no recovery. Under the Plan, the Debtors project that holders of secured claims will receive payment of the value of their claims. Holders of administrative claims will receive payment in full shortly after the Confirmation Date. Holders of general unsecured claims will receive a 30% distribution over time on account of their claims. Accordingly, the Debtors believe the Plan meets the best interests test.

C.     Financial Feasibility Test.

In addition to the requirements discussed above, the Bankruptcy Code requires that consummation of a plan will not likely be followed by the liquidation or the need for further financial reorganization of the debtor. In this case, the Plan allows the Debtors to manage their prepetition debts. The Plan provides a recovery for the creditors while reserving sufficient funds to operate the business going forward. The Debtors believe the Plan conservatively projects

future income and the Debtors anticipate their experience will be as good or better than the projections, allowing them to sustain operations going forward. Accordingly, the Debtors believe that the Plan passes the feasibility test.

X.    CONCLUSION.

The Plan offers the best alternative for recovery to all creditors. If the Debtors were liquidated in Chapter 7, holders of general unsecured claims would recovery nothing. Accordingly, the Debtors request that each holder of a claim complete and return the ballot, and accept the proposed Plan.

[Signatures on following page.]

IN WITNESS WHEREOF, the undersigned has executed this Disclosure Statement in Support of Joint Plan of Reorganization of PGI Companies, Inc., and PGI Fulfillment, Inc., as of the date and year set forth above.

**PGI Companies, Inc.**

By: _____
Jeffory Brower
CEO

**PGI Fulfillment, Inc.**

By: _____
Jeffory Brower
CEO

/s/ Douglas W. Kassebaum
Clinton E. Cutler (#158094)
Douglas W. Kassebaum (#386802)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, #4000
Minneapolis, MN 55402
Telephone: (612) 492-7292
Facsimile: (612) 492-7070
dkassebaum@fredlaw.com

ATTORNEYS FOR DEBTOR

4610819_2/043007.0888

**Exhibit A:**

**Income & Expense Projections**

**PGI COMPANIES, INC.**
**PROJECTED STATEMENT OF CASH FLOWS**
**FOR THE ACTUAL SIX-MONTHS ENDED JUNE 30, 2009 AND FOR THE PROJECTED FOUR MONTHS**
**ENDING OCTOBER 31, 2009 AND FOR THE MONTHS ENDING NOVEMBER 30, 2009 AND DECEMBER 31, 2009**

| | ACTUAL YTD 6/30/09 | PROJECTED JULY - OCT 2009 | PROJECTED NOVEMBER 2009 | PROJECTED DECEMBER 2009 | TOTAL FYE 12/31/09 |
|---|---|---|---|---|---|
| **CASH – BEGINNING** | $ (34,000) | $ 554,000 | $ 175,000 | $ 51,000 | $ (34,000) |
| **CASH PROVIDED BY (USED FOR) OPERATING ACTIVITIES** | | | | | |
| Net Income (Loss) from Page 2 | (390,000) | (229,000) | 53,000 | 71,000 | (495,000) |
| RECONCILING ADJUSTMENTS: | | | | | |
| Depreciation and Amortization | 332,000 | 202,000 | 50,000 | 50,000 | 634,000 |
| (Gain) Loss - Sale of Equipment | (57,000) | - | - | - | (57,000) |
| Bad Debts | 30,000 | 20,000 | 5,000 | 5,000 | 60,000 |
| DECREASE (INCREASE) IN: | | | | | |
| Accounts Receivable | 701,000 | (682,000) | (30,000) | 20,000 | 9,000 |
| Inventory/Work In Process | 512,000 | (62,000) | (35,000) | 105,000 | 520,000 |
| Other Current Assets | 89,000 | (21,000) | - | - | 68,000 |
| INCREASE (DECREASE) IN: | | | | | |
| Accounts Payable | 12,000 | 113,000 | (23,000) | 13,000 | 115,000 |
| Other Accrued Expenses | (176,000) | 314,000 | (105,000) | (105,000) | (72,000) |
| Decrease (Increase) - Postage Assets | 407,000 | (13,000) | - | - | 394,000 |
| Increase (Decrease) - Postage Liabilities | (548,000) | 95,000 | - | - | (453,000) |
| Increase (Decrease) - Other | 19,000 | - | - | - | 19,000 |
| Net Cash Provided by (Used for) Operating Activities | 931,000 | (263,000) | (85,000) | 159,000 | 742,000 |
| **CASH PROVIDED BY (USED FOR) INVESTING ACTIVITIES** | | | | | |
| Purchases - Property and Equipment | (32,000) | - | - | - | (32,000) |
| Proceeds - Sale of Equipment | 57,000 | - | - | - | 57,000 |
| Purchases - Software Conversion | (35,000) | - | - | - | (35,000) |
| Net Cash Provided by (Used for) Investing Activities | (10,000) | - | - | - | (10,000) |
| **CASH PROVIDED BY (USED FOR) FINANCING ACTIVITIES** | | | | | |
| Payments on Long Term Debt - ACFI | (271,000) | (89,000) | (31,000) | (31,000) | (422,000) |
| Payments on Long Term Debt - Bremer & Chase | (62,000) | (27,000) | (8,000) | (9,000) | (106,000) |
| Proceeds from Long-Term Debt | - | - | - | - | - |
| Distributions for Tax Obligations | - | - | - | - | - |
| Net Cash Provided by (Used for) Financing Activities | (333,000) | (116,000) | (39,000) | (40,000) | (528,000) |
| **NET INCREASE (DECREASE) IN CASH** | 588,000 | (379,000) | (124,000) | 119,000 | 204,000 |
| **CASH – ENDING** | $ 554,000 | $ 175,000 | $ 51,000 | $ 170,000 | $ 170,000 |

**PGI COMPANIES, INC**
**PROJECTED STATEMENT OF OPERATIONS**
**FOR THE ACTUAL SIX-MONTHS ENDED JUNE 30, 2009 AND FOR THE PROJECTED FOUR MONTHS**
**ENDING OCTOBER 31, 2009 AND FOR THE MONTHS ENDING NOVEMBER 30, 2009 AND DECEMBER 31, 2009**

| | ACTUAL YTD 6/30/09 | PROJECTED JULY - OCT 2009 | 11/1/09 Adjustments | PROJECTED NOVEMBER 2009 | PROJECTED DECEMBER 2009 | TOTAL FYE 12/31/09 |
|---|---|---|---|---|---|---|
| **SALES** | $ 8,088,000 | $ 5,625,000 | $ - | $ 1,475,000 | $ 1,525,000 | $ 16,713,000 |
| **DIRECT COSTS** | 2,871,000 | 2,066,000 | (128,000) | 543,000 | 561,000 | 5,913,000 |
| **VALUE ADDED SALES** | 5,217,000 | 3,559,000 | 128,000 | 932,000 | 964,000 | 10,800,000 |
| **MANUFACTURING EXPENSES** | | | | | | |
| Direct | 1,509,000 | 1,206,000 | - | 293,000 | 303,000 | 3,311,000 |
| Indirect | 2,594,000 | 1,578,000 | - | 386,000 | 390,000 | 4,948,000 |
| Total Manufacturing Expenses | 4,103,000 | 2,784,000 | - | 679,000 | 693,000 | 8,259,000 |
| **GROSS MARGIN** | 1,114,000 | 775,000 | 128,000 | 253,000 | 271,000 | 2,541,000 |
| **OPERATING EXPENSES** | | | | | | |
| Selling Expense | 722,000 | 476,000 | - | 118,000 | 118,000 | 1,434,000 |
| General and Administrative Expense | 416,000 | 260,000 | (30,000) | 64,000 | 64,000 | 774,000 |
| Total Operating Expenses | 1,138,000 | 736,000 | (30,000) | 182,000 | 182,000 | 2,208,000 |
| **INCOME (LOSS) FROM OPERATIONS BEFORE INTEREST AND IMPAIRMENT** | (24,000) | 39,000 | 158,000 | 71,000 | 89,000 | 333,000 |
| **INTEREST (EXPENSE)** | (185,000) | (118,000) | - | (18,000) | (18,000) | (339,000) |
| **IMPAIRMENT (LOSS) ON LONG-TERM ASSETS** | - | - | (556,000) | - | - | (556,000) |
| **(LOSS) DUE TO UNCOLLECTIBLE NOTE RECEIVABLE** | - | - | (2,547,000) | - | - | (2,547,000) |
| **OTHER INCOME (EXPENSE)** | 44,000 | - | - | - | - | 44,000 |
| **INCOME (LOSS) BEFORE REORGANIZATION ITEMS** | (165,000) | (79,000) | (2,945,000) | 53,000 | 71,000 | (3,065,000) |
| **REORGANIZATION ITEMS** | | | | | | |
| Gain (Loss) on Disposal of Assets to Liquidate Creditor Claims | - | | - | - | - | - |
| Professional Fees | (105,000) | (150,000) | - | - | - | (255,000) |
| Provision for Rejected Executory Contracts | - | - | (201,000) | - | - | (201,000) |
| Other (Expenses) | (120,000) | - | - | - | - | (120,000) |
| Reorganization Items - Net Income (Expense) | (225,000) | (150,000) | (201,000) | - | - | (576,000) |
| **GAIN (LOSS) FROM CONTINUING OPERATIONS BEFORE EXTRAORDINARY ITEMS** | (390,000) | (229,000) | (3,146,000) | 53,000 | 71,000 | (3,641,000) |
| **GAIN ON FORGIVENESS OF DEBT** | - | - | 2,449,000 | - | - | 2,449,000 |
| **NET INCOME (LOSS)** | $ (390,000) | $ (229,000) | $ (697,000) | $ 53,000 | $ 71,000 | $ (1,192,000) |

**PGI COMPANIES, INC.**
**PROJECTED STATEMENT OF CASH FLOWS**
**FOR THE YEAR ENDING DECEMBER 31, 2010**

| | | | | | 2010 PROJECTIONS | | | | | | | | Total FYE |
| | 31-Jan | 28-Feb | 31-Mar | 30-Apr | 31-May | 30-Jun | 31-Jul | 31-Aug | 30-Sep | 31-Oct | 30-Nov | 31-Dec | 12/31/2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH – BEGINNING** | $ 170,000 | $ 234,000 | $ 257,000 | $ 105,000 | $ 182,000 | $ 374,000 | $ 391,000 | $ 249,000 | $ 271,000 | $ 210,000 | $ 347,000 | $ 372,000 | $ 170,000 |
| **CASH PROVIDED BY (USED FOR) OPERATING ACTIVITIES** | | | | | | | | | | | | | |
| Net Income (Loss) From Page 4 | 22,000 | 30,000 | 65,000 | 35,000 | 121,000 | 8,000 | - | 57,000 | 18,000 | 27,000 | 11,000 | 3,000 | 397,000 |
| RECONCILING ADJUSTMENTS: | | | | | | | | | | | | | |
| Depreciation and Amortization | 37,000 | 37,000 | 37,000 | 37,000 | 38,000 | 38,000 | 38,000 | 38,000 | 39,000 | 39,000 | 39,000 | 39,000 | 456,000 |
| (Gain) Loss - Sale of Equipment | - | - | - | - | (130,000) | - | - | - | - | - | - | - | (130,000) |
| Bad Debts | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| DECREASE (INCREASE) IN: | | | | | | | | | | | | | |
| Accounts Receivable | 95,000 | 95,000 | (180,000) | (5,000) | 270,000 | 95,000 | (5,000) | (180,000) | (30,000) | 70,000 | 20,000 | 70,000 | 315,000 |
| Inventory/Work In Process | (35,000) | (85,000) | 85,000 | 105,000 | (35,000) | 20,000 | (125,000) | 90,000 | (20,000) | 35,000 | 20,000 | (130,000) | (75,000) |
| Other Current Assets | (50,000) | - | - | - | - | - | - | - | - | - | - | - | (50,000) |
| INCREASE (DECREASE) IN: | | | | | | | | | | | | | |
| Accounts Payable | 75,000 | 26,000 | 49,000 | (53,000) | (55,000) | 16,000 | (7,000) | 60,000 | 62,000 | 9,000 | (21,000) | (9,000) | 152,000 |
| Other Accrued Expenses | (30,000) | (30,000) | (30,000) | - | (125,000) | - | - | - | - | - | - | - | (215,000) |
| Net Cash Provided by (Used for) Operating Activities | 119,000 | 78,000 | 31,000 | 124,000 | 89,000 | 182,000 | (94,000) | 70,000 | 74,000 | 185,000 | 74,000 | (22,000) | 910,000 |
| **CASH PROVIDED BY (USED FOR) INVESTING ACTIVITIES** | | | | | | | | | | | | | |
| Purchases - Property and Equipment | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (180,000) |
| Proceeds - Sale of Equipment | - | - | - | - | 150,000 | - | - | - | - | - | - | - | 150,000 |
| Purchases - Software Conversion | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Cash Used for Investing Activities | (15,000) | (15,000) | (15,000) | (15,000) | 135,000 | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (30,000) |
| **CASH PROVIDED BY (USED FOR) FINANCING ACTIVITIES** | | | | | | | | | | | | | |
| Payments on Long Term Debt - ACFI | (31,000) | (31,000) | (31,000) | (31,000) | (32,000) | (31,000) | (32,000) | (32,000) | (32,000) | (32,000) | (33,000) | (32,000) | (380,000) |
| Payments on Long Term Debt - Bremer & Chase | (9,000) | (9,000) | (9,000) | (1,000) | - | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (35,000) |
| Payments on Pre-Petition Payables | - | - | (87,000) | - | - | (61,000) | - | - | (61,000) | - | - | (61,000) | (270,000) |
| Proceeds from Long-Term Debt | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Distributions for Tax Obligations | - | - | (41,000) | - | - | (57,000) | - | - | (26,000) | - | - | (14,000) | (138,000) |
| Net Cash Provided by (Used for) Financing Activities | (40,000) | (40,000) | (168,000) | (32,000) | (32,000) | (150,000) | (33,000) | (33,000) | (120,000) | (33,000) | (34,000) | (108,000) | (823,000) |
| **NET INCREASE (DECREASE) IN CASH** | 64,000 | 23,000 | (152,000) | 77,000 | 192,000 | 17,000 | (142,000) | 22,000 | (61,000) | 137,000 | 25,000 | (145,000) | 57,000 |
| **CASH – ENDING** | $ 234,000 | $ 257,000 | $ 105,000 | $ 182,000 | $ 374,000 | $ 391,000 | $ 249,000 | $ 271,000 | $ 210,000 | $ 347,000 | $ 372,000 | $ 227,000 | $ 227,000 |

**PGI COMPANIES, INC**
**PROJECTED STATEMENT OF OPERATIONS**
**FOR THE YEAR ENDING DECEMBER 31, 2010**

2010 PROJECTIONS

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | Totals 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SALES** | $1,375,000 | $1,425,000 | $1,550,000 | $1,425,000 | $1,275,000 | $1,325,000 | $1,300,000 | $1,475,000 | $1,350,000 | $1,375,000 | $1,325,000 | $1,300,000 | $16,500,000 |
| **DIRECT COSTS** | 526,000 | 545,000 | 594,000 | 545,000 | 487,000 | 506,000 | 498,000 | 565,000 | 518,000 | 526,000 | 506,000 | 498,000 | 6,314,000 |
| **VALUE ADDED SALES** | 849,000 | 880,000 | 956,000 | 880,000 | 788,000 | 819,000 | 802,000 | 910,000 | 832,000 | 849,000 | 819,000 | 802,000 | 10,186,000 |
| **MANUFACTURING EXPENSES** | | | | | | | | | | | | | |
| Direct | 258,000 | 267,000 | 290,000 | 267,000 | 238,000 | 248,000 | 242,000 | 275,000 | 251,000 | 256,000 | 247,000 | 241,000 | 3,080,000 |
| Indirect | 370,000 | 373,000 | 382,000 | 373,000 | 364,000 | 367,000 | 366,000 | 378,000 | 369,000 | 371,000 | 368,000 | 366,000 | 4,447,000 |
| Total Manufacturing Expenses | 628,000 | 640,000 | 672,000 | 640,000 | 602,000 | 615,000 | 608,000 | 653,000 | 620,000 | 627,000 | 615,000 | 607,000 | 7,527,000 |
| **GROSS MARGIN** | 221,000 | 240,000 | 284,000 | 240,000 | 186,000 | 204,000 | 194,000 | 257,000 | 212,000 | 222,000 | 204,000 | 195,000 | 2,659,000 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | |
| Selling Expense | 117,000 | 118,000 | 122,000 | 118,000 | 113,000 | 114,000 | 113,000 | 119,000 | 113,000 | 114,000 | 112,000 | 111,000 | 1,384,000 |
| General and Administrative Expense | 64,000 | 74,000 | 79,000 | 69,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 798,000 |
| Total Operating Expenses | 181,000 | 192,000 | 201,000 | 187,000 | 177,000 | 178,000 | 177,000 | 183,000 | 177,000 | 178,000 | 176,000 | 175,000 | 2,182,000 |
| **INCOME (LOSS) FROM OPERATIONS** | 40,000 | 48,000 | 83,000 | 53,000 | 9,000 | 26,000 | 17,000 | 74,000 | 35,000 | 44,000 | 28,000 | 20,000 | 477,000 |
| **OTHER INCOME (EXPENSE)** | | | | | | | | | | | | | |
| Interest (Expense) | (18,000) | (18,000) | (18,000) | (18,000) | (18,000) | (18,000) | (17,000) | (17,000) | (17,000) | (17,000) | (17,000) | (17,000) | (210,000) |
| Gain on Disposal of Assets | - | - | - | - | 130,000 | - | - | - | - | - | - | - | 130,000 |
| Total Other Income (Expense) | (18,000) | (18,000) | (18,000) | (18,000) | 112,000 | (18,000) | (17,000) | (17,000) | (17,000) | (17,000) | (17,000) | (17,000) | (80,000) |
| **NET INCOME (LOSS)** | $ 22,000 | $ 30,000 | $ 65,000 | $ 35,000 | $ 121,000 | $ 8,000 | $ - | $ 57,000 | $ 18,000 | $ 27,000 | $ 11,000 | $ 3,000 | $ 397,000 |

**PGI COMPANIES, INC.**
**PROJECTED STATEMENT OF CASH FLOWS**
**FOR THE YEARS ENDING DECEMBER 31, 2011, 2012, 2013, AND 2014**

| | PROJECTED | | | |
|---|---|---|---|---|
| | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 |
| **CASH – BEGINNING** | $ 227,000 | $ 249,000 | $ 212,000 | $ 306,000 |
| **CASH PROVIDED BY (USED FOR) OPERATING ACTIVITIES** | | | | |
| Net Income (Loss) From Page 6 | 567,000 | 786,000 | 901,000 | 1,059,000 |
| RECONCILING ADJUSTMENTS: | | | | |
| Depreciation and Amortization | 415,000 | 329,000 | 392,000 | 413,000 |
| (Gain) Loss - Sale of Equipment | - | - | - | - |
| Bad Debts | 63,000 | 66,000 | 69,000 | 72,000 |
| DECREASE (INCREASE) IN: | | | | |
| Accounts Receivable | (138,000) | (166,000) | (169,000) | (172,000) |
| Inventory/Work In Process | (160,000) | (60,000) | (60,000) | (60,000) |
| Other Current Assets | - | - | - | - |
| INCREASE (DECREASE) IN: | | | | |
| Accounts Payable | 288,000 | 294,000 | 194,000 | 69,000 |
| Other Accrued Expenses | 20,000 | 20,000 | 20,000 | 20,000 |
| Net Cash Provided by (Used for) Operating Activities | 1,055,000 | 1,269,000 | 1,347,000 | 1,401,000 |
| **CASH PROVIDED BY (USED FOR) INVESTING ACTIVITIES** | | | | |
| Purchases - Property and Equipment | (180,000) | (362,000) | (800,000) | (200,000) |
| Proceeds - Sale of Equipment | - | - | - | - |
| Purchases - Software Conversion | - | - | - | - |
| Net Cash Used for Investing Activities | (180,000) | (362,000) | (800,000) | (200,000) |
| **CASH PROVIDED BY (USED FOR) FINANCING ACTIVITIES** | | | | |
| Payments on Long Term Debt - ACFI | (400,000) | (420,000) | (442,000) | (465,000) |
| Payments on Long Term Debt - Chase | (10,000) | (4,000) | - | - |
| Payments on Long Term Debt - Other | - | - | (51,000) | (108,000) |
| Payments on Pre-Petition Payables | (245,000) | (245,000) | (245,000) | (246,000) |
| Proceeds from Long-Term Debt | - | - | 600,000 | - |
| Distributions for Tax Obligations | (198,000) | (275,000) | (315,000) | (371,000) |
| Net Cash Provided by (Used for) Financing Activities | (853,000) | (944,000) | (453,000) | (1,190,000) |
| **NET INCREASE (DECREASE) IN CASH** | 22,000 | (37,000) | 94,000 | 11,000 |
| **CASH – ENDING** | $ 249,000 | $ 212,000 | $ 306,000 | $ 317,000 |

**PGI COMPANIES, INC**
**PROJECTED STATEMENT OF OPERATIONS**
**FOR THE YEARS ENDING DECEMBER 31, 2011, 2012, 2013, AND 2014**

|  | ANNUAL PROJECTIONS | | | |
| --- | --- | --- | --- | --- |
|  | 2011 | 2012 | 2013 | 2014 |
| **SALES** | $ 18,000,000 | $ 19,000,000 | $ 20,000,000 | $ 21,000,000 |
| **DIRECT COSTS** | 7,065,000 | 7,458,000 | 7,850,000 | 8,243,000 |
| **VALUE ADDED SALES** | 10,935,000 | 11,542,000 | 12,150,000 | 12,757,000 |
| **MANUFACTURING EXPENSES** | | | | |
| Direct | 3,295,000 | 3,502,000 | 3,689,000 | 3,877,000 |
| Indirect | 4,643,000 | 4,764,000 | 5,013,000 | 5,224,000 |
| Total Manufacturing Expenses | 7,938,000 | 8,266,000 | 8,702,000 | 9,101,000 |
| **GROSS MARGIN** | 2,997,000 | 3,276,000 | 3,448,000 | 3,656,000 |
| **OPERATING EXPENSES** | | | | |
| Selling Expense | 1,392,000 | 1,432,000 | 1,469,000 | 1,502,000 |
| General and Administrative Expense | 858,000 | 898,000 | 938,000 | 975,000 |
| Total Operating Expenses | 2,250,000 | 2,330,000 | 2,407,000 | 2,477,000 |
| **INCOME (LOSS) FROM OPERATIONS** | 747,000 | 946,000 | 1,041,000 | 1,179,000 |
| **OTHER INCOME (EXPENSE)** | | | | |
| Interest (Expense) | (180,000) | (160,000) | (140,000) | (120,000) |
| Total Other Income (Expense) | (180,000) | (160,000) | (140,000) | (120,000) |
| **NET INCOME (LOSS)** | $ 567,000 | $ 786,000 | $ 901,000 | $ 1,059,000 |

**Exhibit B:**

**Hypothetical Chapter 7 Liquidation Analysis**

## Liquidation Analysis
### (@ 8/28/09)

| Current Asset Values | | discount | |
|---|---|---|---|
| Cash balance | 205,234 | 0% | 205,234 |
| Accounts Receivable -trade | 2,423,813 | 35% | 1,575,478 |
| Raw inventory | 316,000 | 65% | 110,600 |
| Work in Process | 450,000 | 100% | 0 |
| **Total Current Asset Values** | 3,395,047 | | **1,891,312** |

| Equipment | | | |
|---|---|---|---|
| Forced Liquidation (1/15/09) | 1,976,350 | | |
| *adjustments* | | | |
| 4 color Heidelberg (sold) | (30,000) | | |
| Ryobi (sold) | (2,000) | | |
| Ehret (Bremer, $47,500) | (47,500) | | |
| 2008 Chrysler (Chase, $27,000) | (20,000) | | |
| Muller Martini stitcher (sold) | (20,000) | | |
| Total (adjusted) | 1,856,850 | 50% | 928,425 |
| **Streamlyne software @ liquidation value** | 715,164 | 100% | 0 |

| Liquidation expenses | |
|---|---|
| rent, 2 months @ $50k/mo (incl utilities) | (100,000) |
| auction/broker fees @ 10% | (92,843) |
| **Total Equipment @ liquidation value** | **735,583** |
| **Total Assets @ Liquidation Values** | **2,626,895** |

| Due ACFI as of August 28, 2009 | |
|---|---|
| Line of Credit | 1,960,726 |
| Term Loan | 1,702,772 |
| **Total** | **3,663,498** |

| **Shortfall** | **(1,036,603)** |
|---|---|

liquidation0828